HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KAREN GINSBURG, et al.,

        Plaintiffs,

    v.

COMCAST CABLE
COMMUNICATIONS MANAGEMENT
LLC,

        Defendant.

CASE NO. C11-1959RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on Plaintiffs' motion to certify a class.  No party requested oral argument, and the court finds oral argument unnecessary.  For the reasons stated below, the court DENIES the motion (Dkt. # 65) and declines to certify a class.  The court GRANTS Plaintiffs' motion (Dkt. # 103) requesting that the court accept a supplemental brief that Plaintiffs filed to address recent supplemental authority that Defendant cited.

Since 2007, thousands of people have worked as customer account executives ("CAEs") at the three Washington call centers that Defendant Comcast Cable Communications Management, LLC ("Comcast") operates.  Among those CAEs were Plaintiffs Karen Ginsburg and Jessica Walker.  Most CAEs spend most of their time on the telephone with Comcast customers, assisting them with inquiries ranging from the

ORDER – 1

purchase of new cable television and internet services to problems with existing services to billing concerns and more.  Both Plaintiffs, who like all CAEs were hourly-paid employees, contend that they regularly arrived at work before the scheduled start of their shifts in order to perform tasks preliminary to answering customer phone calls.  They say they received no pay for this preliminary work, in violation of the Washington Minimum Wage Act (RCW Ch. 49.46) and other Washington wage-and-hour laws.

Plaintiffs also hope to bring similar claims on behalf of all other Washington CAEs.  They ask the court to certify a class consisting of the more than 2000 CAES who have worked at Comcast's Washington call centers since October 2007,[1] invoking Federal Rule of Civil Procedure 23.

The standards applicable to a Rule 23 motion inform the court's survey of the mountain of evidence that the parties have submitted.  Accordingly, the court begins with a discussion of those standards, after which it will consider the parties' evidence.

## II.  ANALYSIS

The court's decision to certify a class is discretionary.  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009).  Rule 23 guides the court's exercise of discretion.  A plaintiff "bears the burden of demonstrating that he has met each of the four requirements of Rule 23(a) and at least one of the [three] requirements of Rule 23(b)." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 724 (9th Cir. 2007).  Rule 23(a) requires a plaintiff to demonstrate that the proposed class is sufficiently numerous, that it presents common issues of fact or law, that it will be led by one or more class representatives with claims typical of the class, and that the class representatives will adequately represent the class.  *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 161 (1982); Fed. R. Civ. P. 23(a)(1)-(4).  If a plaintiff satisfies the Rule 23(a) requirements,

---

[1] The class definition Plaintiffs propose includes some call center employees who might not be CAEs.  In addition, Comcast contends that the proposed class period extends beyond the applicable statute of limitations.  The court need not address either of these issues in light of its disposition today.

ORDER – 2

1    she must also show that the proposed class action meets one of the three requirements of

2    Rule 23(b).  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

3    Plaintiffs in this case invoke only Rule 23(b)(3), which requires them to show that

4    "questions of law or fact common to class members predominate over any questions

5    affecting only individual members, and that a class action is superior to other available

6    methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

7          Rule 23 is not a "mere pleading standard," it places an evidentiary burden on a

8    plaintiff who hopes to represent a class.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

9    2551 (2011) ("A [plaintiff] must affirmatively demonstrate his compliance with the rule –

10   that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties,

11   common questions of law or fact, etc.").  To satisfy that burden, the court must conduct a

12   "rigorous analysis" that may well have "some overlap with the merits of the plaintiff's

13   underlying claim."  *Id.*  That overlap, however, must be no more extensive than necessary

14   to ensure that the plaintiff has satisfied Rule 23's prerequisites.  *Amgen Inc. v. Conn. Ret.*

15   *Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013) ("Merits questions may be considered

16   to the extent – but only to the extent – that they are relevant to determining whether the

17   Rule 23 prerequisites for class certification are satisfied.").

18         The court's analysis today will focus on the commonality requirement of Rule

19   23(a)(2) as well as the predominance and superiority requirements of Rule 23(b)(3).  No

20   one contests that the proposed class is sufficiently numerous.  Comcast contends that

21   neither Ms. Walker nor Ms. Ginsburg have claims typical of the class, but the court need

22   not address that contention in light of its disposition today.  Moreover, the court will

23   consider only Plaintiffs' claims that CAEs routinely performed uncompensated work at

24   the beginning of the workday.  Although Plaintiffs' complaint contends that Comcast

25   failed to pay CAEs for post-shift work, failed to provide required breaks, and failed to

26   properly compensate employees after terminating them, their class certification motion

27

28   ORDER – 3

does not mention those claims.  Plaintiffs also have a claim invoking the Washington Consumer Protection Act ("CPA"), to which they devote two paragraphs in their class certification motion.  They make no attempt to demonstrate that they can litigate their CPA claim on a classwide basis.[2]

A.     **Rule 23(a)(2): Commonality**

By its text, Rule 23(a)(2) merely requires a plaintiff to show that "there are questions of law or fact common to the class."  In *Wal-Mart*, however, the Supreme Court explained that "common" in this context does not merely mean a question underlying all class members' claims.  "Any competently crafted class complaint literally raises common 'questions.'"  *Wal-Mart*, 131 S. Ct. at 2551 (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-32 (2009)).  This case is no exception:  Was Comcast bound by Washington's wage-and-hour laws?  What systems did Comcast employees use to record the time they worked?  What were Comcast's written policies for recording working hours?  These are questions common to the class, but answering them will barely advance the class claims to resolution.  *Id.* ("What matters to class certification . . . is not the raising of common 'questions' – even in droves – but rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (quoting Nagareda, *supra*, at 132).  The *Wal-Mart* Court required that all class members' claims "depend upon a common contention," and that the common contention be "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  131 S. Ct. at 2551.  Even a single common question, provided it meets the *Wal-Mart* standard, satisfies Rule 23(a)(2)'s commonality requirement.  *Id.* at 2556.

---

[2] The court has twice addressed Plaintiffs' CPA claim, limiting it to a claim that Comcast's publicly-disseminated job solicitations were deceptive.  *See* May 8, 2012 ord. (Dkt. # 29) & Feb. 12, 2013 ord. (Dkt. # 99).

ORDER – 4

Ms. Ginsburg and Ms. Walker succeed in raising at least one common question. To explain that conclusion, the court begins its survey of the evidence.

Comcast's approximately 900 currently-employed Washington CAEs work under 77 immediate supervisors, who in turn work under 10 managers, who in turn work under 4 directors, all of whom work under a single vice-president. The supervisors and CAEs work in call centers in Lynnwood, Fife, and Everett, with the exception of about 100 "virtual" CAEs who work from home. Most CAEs spend most of their time on the telephone. For most CAEs, that means speaking directly to Comcast customers who call with questions. Some CAEs make outbound calls to customers, some CAEs receive calls from customers only after another CAE directs the call to them, some CAEs receive calls from other CAEs who need assistance, and still other CAEs are responsible only for reviewing the work of other CAEs. No party provides information on how many CAEs serve in each role, but the evidence before the court favors the conclusion that most CAEs spend most of their time on the phone. Were it necessary, Plaintiffs could likely modify their class definition to exclude those relatively few CAEs whose duties differ so substantially from others' that their claims do not belong in this action.

According to Plaintiffs, there is systemic pressure for Washington CAEs to maximize their time on the telephone and minimize their time devoted to other tasks. Because each CAE must log into the telephone system to use the phones, and must enter an "AUX" code into the system when he or she is unavailable to answer calls, Comcast is able to monitor CAE phone time. Several emails among the directors and managers show that they monitor phone time on a daily basis, and that one of management's primary efficiency metrics is the percentage of time that CAEs are unavailable to take (or make) calls. The emails reveal a management goal to reduce that percentage, although they do not reveal whether or how managers communicated with supervisors or CAEs to achieve that goal.

ORDER – 5

According to Plaintiffs, these efficiency pressures lead ineluctably to pressure on individual CAEs to complete their preliminary tasks before their shifts began, thus maximizing the amount of time that they spend on the phone.  The evidence Plaintiffs offer to support that contention comes primarily in two forms.  The first is anecdotal evidence from Ms. Walker, Ms. Ginsburg, and about 15 other former CAEs.  All of them offer evidence that Comcast pressured them to minimize their non-telephone time.  All of them explain that before taking calls each shift, they needed to log into their computers, launch several Comcast programs, and review emails and other Comcast communications updating them on new products, new services, new policies, and the like.  All of them contend that as the result of pressure to minimize the time they spent performing these tasks, they regularly worked off the clock before their shifts began.

Supplementing the anecdotal evidence is Comcast's admission that it imposed a "preshift" period for CAEs.  The unfortunately-named "preshift" is a *paid* period at the beginning of a shift in which CAEs are expected to accomplish all tasks preliminary to taking phone calls.  The parties dispute not only when Comcast first implemented a "preshift" period but also the duration of that period.  There is evidence that it did not exist at all for some CAEs, and that it was as long as 15 minutes for others.  Nonetheless, it is safe to conclude that at least some CAEs received a "preshift" period as a matter of Comcast policy.  The existence of a "preshift" period confirms that Comcast expected employees to maximize telephone time, confining preliminary tasks to a brief window of time.

The second primary form of evidence supporting Plaintiffs' contentions is a data analysis from Dr. Robert Abbott, a statistician at the University of Washington.  Dr. Abbott compared Comcast data that showed when CAEs logged into their computers for each shift to data that showed the time that the CAEs' shifts began for timekeeping and pay purposes.  Those data came from two different sources: the computer log-in data

ORDER – 6

from Comcast's network, the timekeeping data from the "ESS" system that CAEs use to record their time for pay purposes. Dr. Abbott's analysis reveals that CAEs regularly logged in to their computers in advance of the start of their paid shifts, and that on average, CAEs logged in between 9 and 13 minutes early. Collectively, according to Dr. Abbott, more than 95,000 hours passed between CAEs' log-in times and the beginning of their paid shifts.

This evidence reveals common questions whose answers are apt to drive a classwide resolution of Plaintiffs' claims. What sort of work did Comcast expect CAEs to complete in advance of taking phone calls, and how long would that work reasonably take? Did Comcast's managers and directors pressure their subordinates to minimize the time that CAEs worked but were not on the telephone? Did that pressure drive policies (including a "preshift" period) that made it difficult or impossible for CAEs to complete their preliminary work while they were on the clock?[3] The court finds that the answers to these questions could be derived from classwide proof, and that those answers would play a substantial role in driving this litigation to a resolution.

A comparison of this case to *Wal-Mart*, an employee class action in which the Supreme Court found not even a single common question, helps highlight the common questions Ms. Ginsburg and Ms. Walker raise. *Wal-Mart* concerned a proposed class of 1.5 million women who worked at Wal-Mart's 3,400 stores across the nation. 131 S. Ct. at 2547. They contended that although store managers had discretion in making promotion decisions, a "corporate culture" of bias against women at Wal-Mart was so pervasive that it consciously or unconsciously infected those decisions. *Id.* at 2548.

---

[3] Both parties offered evidence of Comcast's formal, written policies. For example, Comcast points to policies that require employees to accurately record all time that they work, whereas Plaintiffs point to policies that prohibit the use of Comcast computers for personal use. The evidence before the court shows that Comcast's informal policies or practices are far more important in determining what actually happens during a CAEs workday. For example, Comcast itself has relied on declarations from CAEs who admit they use their computers for personal purposes, and admit that they do some unquestionably compensable "work" without recording their time.

ORDER – 7

1    There was statistical evidence of a disparity in pay and promotion decisions between men

2    and women who worked at the stores.  *Id.* at 2549.  What was missing, in the *Wal-Mart*

3    majority's view, was "some glue holding the alleged *reasons* for all of those decisions

4    together . . . ."  *Id.* at 2552 (emphasis in original).  The plaintiffs' allegations of a biased

5    corporate culture were inadequate without evidence of a "common mode of exercising

6    discretion that pervade[d] the entire company . . . ."  *Id.* at 2554-55.  For at least those

7    reasons, the Court found "no convincing proof of a companywide discriminatory pay and

8    promotion policy," and thus concluded that the plaintiffs had "not established the

9    existence of any common question."  *Id.* at 2556-57.  In this case, by contrast, Plaintiffs'

10   claims start with the glue that was missing in *Wal-Mart*.  The classwide practice at issue

11   is Comcast's alleged pressure to maximize time spent on the telephone and minimize

12   other types of work.  Plaintiffs have provided some evidence of that pressure, and some

13   evidence that upper management applied that pressure in such a way that it reached

14   CAEs.  The result, Plaintiffs hope to prove, is a work environment in which it is difficult

15   or impossible to complete preliminary work without working off the clock.

16   **B.      Rule 23(b)(3): Predominance and Superiority**

17          In discussing the common questions underlying class members' claims, the court

18   has intentionally omitted a discussion of critical questions that Plaintiffs cannot answer

19   on a classwide basis.  Where a plaintiff identifies at least one common question,

20   differences between class members' claims are not relevant to the commonality inquiry.

21   *See Wal-Mart*, 131 S. Ct. at 2556 (considering dissimilarities in the course of determining

22   that there was no common question underlying class members' claims).  In determining

23   whether common issues predominate in accordance with Rule 23(b)(3), however,

24   differences among class members' claims are crucial.

25          To certify a Rule 23(b)(3) class, the court must find that "questions of law or fact

26   common to class members predominate over any questions affecting only individual

27

28   ORDER – 8

members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The "predominance" and "superiority" prongs of Rule 23 work together to ensure that certifying a class "would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (internal citation and quotation omitted). A "central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole*, at 944 (quoting *Zinser*, 253 F.3d at 1189). Rule 23(b)(3) provides a non-exclusive set of factors to guide the court's predominance and superiority inquiries:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

The court must determine whether resolution of common questions would resolve a "significant aspect" of the class members' claims such that there is "clear justification" for class treatment. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citations omitted).

Whereas Plaintiffs' evidence suggests a common efficiency pressure originating among Comcast's Washington managers and directors, it also reveals a variety of means by which supervisors imposed that pressure on CAEs, and a variety of ways in which CAEs responded to that pressure. Ms. Walker, for example, contends that she received explicit instruction from the person who trained her that she should start work 10-15 minutes before the paid portion of her shift began. Ms. Ginsburg contends that she was merely instructed to be ready to take calls at the end of a 5-minute "preshift" period. Because it was impossible, in her view, to be ready to take calls after only 5 minutes, she

ORDER – 9

worked off the clock before her shift began.  Several of the other former CAEs who provided declarations for Plaintiffs offered similar explanations for their off-the-clock work: their supervisors required them to be ready to take calls in too short a time period. The duration of that time period, however, varied.  Some said their supervisors expected them to be ready to take calls immediately, others reported a "preshift" period of between 5 and 15 minutes.  Still others reported that their supervisors would reduce or eliminate the "preshift" period if incoming call traffic was heavy.  Whereas some supervisors were apparently content to let employees arrive at their own conclusions about the need to start work early, other supervisors suggested or encouraged CAEs to start work off the clock. Some CAEs said nothing about whether their supervisors were aware of their off-the-clock work, whereas others said that their supervisors knew.  A few of the CAEs said that they directly informed their supervisors of the impossibility of completing their preliminary work during the paid "preshift" period.

Even if the court considered only Plaintiffs' anecdotal evidence, it would likely conclude that the common questions Plaintiffs raise do not predominate over questions about what policies Comcast's many supervisors imposed on CAEs, and the many ways in which CAEs responded to those policies.  Comcast has offered its own evidence, however, which highlights other crucial questions that require individual proof.

Comcast offers its own anecdotal evidence, consisting of 50 declarations from its current CAEs.[4]  Every one of them insists that Comcast has trained them to record their work time accurately and has forbidden them to work off the clock.  Almost all of them report a consistent 10-minute "preshift" period and assert that the "preshift" period is

---

[4] Plaintiffs warn the court to be wary of Comcast's CAE declarations, which they believe are inherently biased.  The court agrees that there is reason to suspect that CAEs providing declarations at their current employer's behest would not speak freely, but there is also reason to suspect that former CAEs providing declarations at the behest of attorneys representing Plaintiffs would have an incentive to shape their testimony to the attorneys' needs.  For example, although almost every CAE declaration Plaintiffs obtained points to an "exception log" that Comcast used to record work time outside of a scheduled shift, Plaintiffs do not respond to Comcast's evidence that Washington CAEs have not used an "exception log" in more than ten years.

ORDER – 10

adequate to complete all preliminary work.  Many of them report that they arrive at work early each day, but that they do not actually start work until the scheduled beginning of their shifts.  Before their shifts, they socialize with coworkers, use breakroom facilities, or attend to other personal business.  Some of them log into their computers before their shifts begin, but only to use the computers for personal matters.  A few of them report that they log in to their computers before their shifts begin and that they open Comcast computer programs during that time.  All of those CAEs, however, report that they know that Comcast forbids them to open programs before work begins, and that they choose to do so solely as a matter of personal convenience.  Many CAEs report that they log into their phones before they log into their computers.

The court does not reach any conclusions about whether CAEs' worklife more closely resembles the portrait painted in Plaintiffs' CAE declarations or Comcast's CAE declarations.  The parties offer no evidence about how they selected the employees who provided declarations.  Although both Plaintiffs and Comcast hired statisticians to assist them, neither statistician suggests that the employees the parties selected are representative of any group, much less the class as a whole.  Even if the court needed to accept one of the two starkly different portraits of working life at Comcast's Washington call centers to resolve the class certification motion, it would not be able to do so on the basis of the parties' anecdotal evidence.

What the court does conclude, based on the anecdotal evidence, is that many of the questions critical to the resolution of class members' claims are not susceptible to classwide proof.  For example, Plaintiffs contend for the first time in their reply brief that the "common issue that predominates in this litigation is whether the 'first principal activity' of the CAE workday is the required act of logging into their computers."  Pltfs.' Reply (Dkt. # 92) at 1.  Plaintiffs assert that the answer to this question "will be the same for all class members," *id.*, but the anecdotal evidence leads the court to conclude

ORDER – 11

otherwise.  The anecdotal evidence reveals that some individuals start work by logging into their phones or with some other act.[5]  It also reveals that some individuals log into their computers but do not start work.   Plaintiffs suggest no classwide proof that would establish what act marks the beginning of compensable work, and the evidence suggests that the answer varies for every class member.  Dr. Abbott's mathematical conclusions (which Comcast hired its own statistician to rebut) depend on the assumption that each CAE's work invariably begins when he or she logs on the Comcast computer network.  Without a classwide means of proving the truth of that assumption, his analysis does not demonstrate how much uncompensated work the class collectively performed.

To the extent that Plaintiffs believe that what event commences the workday is a common legal question, the court disagrees.  To be sure, there are legal standards that govern when a workday commences and obligate employers to compensate their employees for the time between the beginning and end of the workday.  *See, e.g.*, WAC § 296-126-002(8) (defining "Hours worked" as "all hours during which the employee is authorized or required by the employer to be on duty . . ."); *Alvarez v. IDP, Inc.*, 339 F.3d 894, 902-03 (9th Cir. 2003) (defining "work" within meaning of Fair Labor Standards Act ("FLSA")); *Drinkwitz v. Alliant Techsystems, Inc.*, 996 P.2d 582, 586 (Wash. 2000) (noting that FLSA "often provides helpful guidance" in interpreting the Washington Minimum Wage Act).  But these legal definitions guide factual inquiries.  In determining whether work prior to a shift is compensable, courts considering FLSA claims consider not only whether the work is "necessary to the principal work performed *and* done for the benefit of the employer."  *Alvarez*, 339 F.3d at 903 (emphasis added).  Although it is likely that logging into Comcast's computer network is necessary to a CAE's principal work, an employee who logs on 15 minutes early to accomplish personal business or as a

---

[5] Dr. Abbott's statistical analysis shows that it was not uncommon for CAEs to log into their computers well after their shifts began, belying Plaintiffs' insistence that logging in is uniformly the first order of business at Comcast.

ORDER – 12

matter of convenience is not doing so for the benefit of the employer.  Under Washington law, that same employee is not "authorized or required" by Comcast to be on duty.  Again, Plaintiffs suggest no classwide means of determining when each class member's daily work began.

Other individualized questions abound.  Plaintiffs' CAE declarations highlight that the way in which the pressure to maximize phone time manifested in the conduct of a particular CAE is an individual inquiry.  Some CAEs reported receiving no paid time to complete preliminary tasks, others reported inadequate paid "preshift" periods of varying durations.  Some worked off the clock without discussing it with their supervisors, others informed their supervisors that they could not complete their preliminary work within the paid "preshift" period.  Some supervisors (or trainers) directly instructed CAEs to work off the clock, others merely encouraged the practice, others were aware of the practice but did not encourage it, and some were arguably unaware of any off-the-clock work.  As the court has noted, there are currently 77 supervisors at Washington's Comcast call centers, supervising CAEs who performed many different types of work.  There have been many more supervisors over the class period.  Plaintiffs suggest no classwide means of demonstrating that each of these 77 supervisors required, encouraged, or knowingly permitted off-the-clock work.

Class members' damages will also require individualized proof.  Most 23(b)(3) class actions ultimately require an individualized damages inquiry.  Where plaintiffs can accomplish that inquiry relatively easily, individualized damages need not prevent class certification.  But in this case, Plaintiffs propose no manageable way to calculate damages.  The data that Dr. Abbott reviewed is no doubt subject to countless different analyses, but Plaintiffs suggest no analysis that would translate that data into a viable damages calculation.  To date, Dr. Abbott has shown only that he can relatively easily calculate a gap between a CAE's log-in time and start time.  He has not shown that he

ORDER – 13

can translate that data into a calculation of the hours a CAE actually worked without compensation. Again, because the evidence suggests no uniform act that commences work for every class member, Dr. Abbott's reliance on computer log-in time is not a reliable estimate of uncompensated work. Even at the class certification stage, a plaintiff must demonstrate a damages methodology that has some potential to reasonably assess damages. *See Comcast Corp. v. Behrend*, No. 11-864, 2013 U.S. LEXIS 2544, at \*14-17 (Mar. 27, 2013). On this record, "individual damage calculations will . . . overwhelm questions common to the class," another obstacle to a finding of predominance. *Id.* at \*14.

In light of these critical issues that require individualized proof, the court finds that the legal and factual questions common to class members do not predominate over questions affecting only individual class members. It is possible that Plaintiffs could ameliorate the impact of some issues requiring individualized proof. For example, to soften the impact of individualized issues arising from different types of CAEs working under different supervisors, Plaintiffs could perhaps designate subclasses or additional class representatives. Dr. Abbott could perhaps massage Comcast's data in ways that help make some of the individualized questions more manageable. The court finds, however, that Plaintiffs would ultimately be unable to prevent the resolution of class members' claims from devolving into individualized inquiries into when class members began "work," inquiries whose answers will vary not only among different class members, but among different days on which any individual class member worked. The common questions Plaintiffs have identified, although significant, do not predominate over these individualized issues.

Because common issues do not predominate, it is not strictly necessary that the court address the "superiority" aspect of Rule 23(b)(3). Because the predominance and superiority requirements overlap in some ways, the court addresses the latter briefly. It is

ORDER – 14

probably the case that a class action would be preferable to individual actions for resolving these CAEs' claims.  The individualized issues the court identified above prevent the court from making a reliable assessment of an average class member's claim, but that value is likely to be relatively small in comparison to the resources required to pursue an individual claim to resolution.  In any event, it would be preferable to resolve those claims in a single forum, given the commonalities among the legal and factual questions.  Nonetheless, because of the individualized issues on which class members' claims would ultimately depend, a class action would be unmanageable.  Plaintiffs have proposed no method to efficiently manage resolution of the individual questions, and no method is apparent to the court.

Before concluding, the court acknowledges that Plaintiffs have pointed the court to three federal districts courts who have certified classes to pursue similar wage-and-hour claims against Comcast.  In two of them, the court considered only whether to certify a FLSA collective action invoking 29 U.S.C. § 216(b), and thus did not consider Rule 23. *Faust v. Comcast Cable Comm'ns Mgmt., LLC*, Civ. Act. WMN-10-2336, 2011 U.S. Dist. LEXIS 125949 (D. Md. Nov. 1, 2011); *Brand v. Comcast Corp.*, No. 12-cv-1122, 2012 U.S. Dist. LEXIS 137714 (N.D. Ill. Sept. 26, 2012).  In the other, the court certified a Rule 23(b)(3) class of CAEs asserting claims arising under the wage-and-hour statutes of Illinois.  *Kernats v. Comcast Corp.*, Nos. 09-c-3368, 09-c-4305, 2010 U.S. Dist. LEXIS 112071 (N.D. Ill. Oct. 20, 2010).  The *Kernats* court reached its decision before the Supreme Court decided *Wal-Mart*.  The court has considered each of these decisions, but notes that while they address similar allegations, the evidence underlying them differs from the evidence before the court, as does the legal framework.

### III.  CONCLUSION

For the reasons stated above, the court DENIES Plaintiffs' motion for class certification (Dkt. # 65) and GRANTS Plaintiffs' motion to file a supplemental brief

ORDER – 15

1   (Dkt. # 103).[6]  The parties shall meet and confer for the purpose of submitting a joint

2   status report no later than May 8, 2013 to propose a schedule for resolving Ms.

3   Ginsburg's and Ms. Walker's individual claims.

4          DATED this 17th day of April, 2013.

5

6

7

8          The Honorable Richard A. Jones
           United States District Court Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

---

23   [6] Plaintiffs moved for leave to file a supplemental brief to address three opinions issued after the
     parties completed briefing, including *Comcast v. Behrend*, *supra*.  Comcast called those opinions

24   to the court's attention without argument via notices of supplemental authority in accordance
     with Local Rules W.D. Wash. LCR 7(n).  Plaintiffs accompanied their motion for leave to file a

25   supplemental brief with the brief itself.  Comcast opposes the motion, but seeks leave to file its
     own supplemental brief if the court entertains Plaintiffs'.  The court has considered Plaintiffs'

26   supplemental brief, but it does not persuade the court to reach a different decision.  Because it
     does not, Comcast will suffer no prejudice from the court granting Plaintiffs' motion without

27   permitting Comcast to file its own supplemental brief.

28   ORDER – 16